230

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BARBARA DENSON, Defendant-Appellant.

(Nos. 56112, 56312 cons.;

First District (2nd Division)—November 20, 1973.

Sam Adam, Edward M. Genson, and Arnette Hubbard, all of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis, Barry Rand Elden, and John Maloney, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Barbara Denson (hereinafter "contemnor") was adjudged in contempt of court for having refused to answer questions propounded to her on various occasions as a witness in a murder trial, and, as a consequence of her refusals, contemnor was committed to the Cook County Jail. This appeal emanates from the adjudgment of contempt.

Before undertaking to state and analyze the issues presented for review, a somewhat detailed recitation of the sequence and substance of the events which transpired before the court below is necessary.

## THE HEARING OF MAY 25, 1971

On May 25, 1971, one Curtis Berry, with whom contemnor had lived for some time, was on trial for murder when contemnor was called upon to testify as a State's witness. After having stated her name and address, contemnor informed the court, outside the presence of the jury, that she did not wish to answer further questions until she had the opportunity to confer with her attorney, who was not present when the questioning began; the court ordered contemnor to answer the questions put to her.

After certain questions were asked by the prosecutor and answered by contemnor, the State sought to impeach contemnor based upon alleged inconsistencies between the answers she had just given and prior statements contemnor had made before the grand jury which had indicted Berry. The court then ruled that a proper foundation had been laid to show inconsistent statements and permitted contemnor to be called as the court's witness subject to cross-examination by both the prosecution and the defense.

After a recess in the proceedings, during which contemnor had the opportunity to confer with her attorney, she returned to the stand, and, except for stating her name and address, refused to answer any further

questions, on advice of counsel, claiming that her answers might tend to incriminate her. Upon motion of the State, the court then entered an order of immunity, pursuant to section 106 of Illinois' Criminal Code (Ill. Rev. Stat. 1969, ch. 38, par. 106 *et seq.*), which conferred upon contemnor immunity from prosecution for any offense shown in whole or in part by her testimony "except perjury in the giving of such testimony." [1]

Following the entry of the immunity order, counsel for contemnor informed the court that contemnor would persist in her refusal to testify, owing to her belief that her testimony would subject her to an indictment for perjury because of the testimony contemnor had given previously before the grand jury which had indicted Berry. Called to the stand again, contemnor persisted in her refusal to testify, and, after the court admonished contemnor with regard to the consequences of her continued refusal, the court found contemnor guilty of direct contempt of court and entered an order which read, in essential part:

"IT IS THEREFORE ORDERED AND ADJUDGED that the contemnor, Barbara Denson, because of the said direct contempt of this Court is hereby committed to the County Jail of Cook County until such time as she appears before this Court and answers the questions propounded to her thereby purging herself of her aforesaid contumacious acts."

Prior to the entry of the contempt order, the court had indicated that contemnor would return to court from day to day to determine whether she would purge herself of contempt. The proceedings were continued, and contemnor was incarcerated in the Cook County Jail.

## THE HEARING ON MAY 26, 1971

On May 26, 1971, contemnor was brought before the court, and again refused to testify in the Berry trial on the grounds that her testimony might incriminate her. Contemnor's counsel explained to the court that contemnor feared a prosecution for perjury which she may have committed before the grand jury, and that if the State would provide contemnor with immunity from prosecution for perjury, then contemnor would reconsider her position relative to her refusal to testify. The State declined to request of the court immunity from a perjury prosecution, and the court continued the proceedings until the following day; contemnor remained in custody.

---

[1] The typewritten immunity order, a pertinent portion of which will be set out further on in this opinion, was not filed until May 26, 1971, and the reason for the delay in filing same is not evident from the record. It is clear from a reading of the record, however, that the grant of immunity in question was made orally by the court on May 25, 1971.

## THE HEARING ON MAY 27, 1971

On May 27, 1971, contemnor was again brought before the court and again refused to testify in the Berry trial, her counsel reiterating the same arguments made in her behalf the previous day. Subsequently, the court stated:

> "The Court is of the opinion that the record clearly shows that Miss Denson has violated the order of the Court to testify even though she has been granted immunity and that she has committed contumacious conduct that is a direct contempt of this Court, and this Court now sentences her to six months in the County Jail or until such time as she purges herself of her contempt, which means that if Miss Denson should change her mind and decide to testify at any time prior thereto she may purge herself of her contempt and be relieved of this order."

Thereafter, the court entered an order and finding of direct contempt by contemnor which concluded:

> "IT IS THEREFORE ORDERED AND ADJUDGED that the contemnor, Barbara Denson, because of the said direct contempt of this Court is hereby sentenced to the County Jail of Cook County for a period of six (6) months or until such time as she appears before this Court and answers the questions propounded to her thereby purging herself of her aforesaid contumacious acts;
> *  *  *."

Contemnor remained in custody.

## THE HEARING ON JUNE 21, 1971

Prior to this hearing date—specifically, on June 11, 1971—contemnor appeared before the court below and, invoking her Fifth Amendment privilege against compulsory self-incrimination, continued her refusal to testify in the Berry matter. However, on June 21, 1971, contemnor came before the court and moved to be allowed to purge herself of contempt by testifying in Curtis Berry's murder trial; that was not possible, though, as a directed verdict of not guilty against Curtis Berry had been rendered by the court sometime between May 24, 1971, and June 21, 1971 (the record presented to this court in the case at bar is unclear as to the precise date on which said directed verdict was rendered).

Counsel for contemnor, relying upon the language of court's order and sentence entered on May 27, 1971—set forth in pertinent part above —argued strenuously that because the May 27th order did not require that contemnor purge herself within the confines of the Curtis Berry proceeding, and because contemnor stood before the court ready to

purge herself, she should be allowed to do so in keeping with the May 27th order. The State took the position that contemnor was "too late" in her attempt to purge herself by testifying, because her only opportunity to do so would have been during the pendency of that proceeding.

The following colloquy between the court and counsel for contemnor took place during argument:

"THE COURT: I think the order speaks for itself. The Court found her in contempt as a direct contempt. It was a criminal contempt, and the Court is entering * * * an order. The Court is now holding that not only * * * does it come too late that she had ample time to purge herself, during the time [*sic*], there is a question in the Court's mind as to Miss Denson's good faith at this juncture. Since it—I am sure Counsel is aware that the case in which she was granted immunity no longer exists. The defendant [Curtis Berry] was discharged on a motion for a directed verdict. And that case no longer exists.

MR. ADAM: All right. Well, then Judge, I take it that she is now sentenced.

THE COURT: To six months.

MR. ADAM: To six months, and she cannot purge herself now. I am taking that is the effect of your Honor's ruling, so she has now a definite sentence."

The court then denied bail on appeal, and a notice of appeal was filed on June 22, 1971.

## I.

The first of two issues contemnor presents for review is whether the immunity from prosecution conferred upon contemnor was as broad in scope as her constitutional privilege against compulsory self-incrimination. In resolving this issue, it is necessary to set out relevant sections of the Illinois Criminal Code, in addition to salient parts of the immunity order entered below.

Illinois' immunity statutes (Ill. Rev. Stat. 1969, ch. 38, par. 106 *et seq.*), under which contemnor was granted immunity, read:

"106—1. Granting of Immunity

In any investigation before a Grand Jury, or trial in any court of record, the court on motion of the State may order that any material witness be released from all liability to be prosecuted or punished on account of any testimony or other evidence he may be required to produce.

106—2. Effect of Immunity
Such order of immunity shall forever be a bar to prosecution against the witness for any offense shown in whole or in part by such testimony or other evidence except for perjury committed in the giving of such testimony.

106—3. Refusal to Testify
Any witness who having been granted immunity refuses to testify or produce other evidence shall be in contempt of court subject to proceedings in accordance to law."

The immunity order, entered orally by the court on May 25, 1971, and filed the next day, reads, in part:

"IT IS THEREBY ORDERED that BARBARA DENSON, pursuant to Chapter 38, Section 106, is granted immunity from prosecution in the above entitled cause from all liability to be prosecuted or punished on account of any testimony or other evidence she may be required to produce, except for perjury committed in the giving of such testimony."

Illinois' perjury statute (Ill. Rev. Stat., ch. 38, par. 32—2) provides:

"(a) A person commits perjury when, under oath or affirmation, in a proceeding or in any other matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true.

(b) Proof of Falsity.
An indictment or information for perjury alleging that the offender, under oath, has made contradictory statements, material to the issue or point in question, in the same or in different proceedings, where such oath or affirmation is required, need not specify which statement is false. At the trial, the prosecution need not establish which statement is false."

Contemnor argues, in syllogistic form, that: (1) if contemnor were to have testified truthfully at the Berry trial, her testimony there would conflict with that previously given before the grand jury; (2) thus, the prosecution would only be required to show the conflict in order to convict contemnor of perjury; and (3) therefore, because contemnor would remain open to a future perjury prosecution, the immunity conferred upon her "was in reality no immunity at all."

■■ Contemnor's argument, and the fear of a future perjury prosecu-

tion upon which the argument is founded, is unsupported by law, and, accordingly, we reject it. See *People v. Walker* (1963), 28 Ill.2d 585, 590, 591, 192 N.E.2d 819.

In the case at hand, the grant of immunity conferred upon contemnor was clearly broad enough to supplant the constitutional privilege against compulsory self-incrimination and to compel contemnor's testimony. The two cases contemnor calls to our attention in support of her argument on this issue, *Kastigar v. United States* (1972), 406 U.S. 441, 32 L.Ed.2d 212, 92 S.Ct. 1653, and *State of New Mexico v. Zamora* (1972), 84 N.M. 245, 501 P.2d 689, are not persuasive in her behalf. *Kastigar* concerned the question whether the conferring of "use and derivative use" immunity, as opposed to "transactional" immunity, was sufficient, under the United States Code, to compel testimony from an unwilling witness who invokes the Fifth Amendment privilege against compulsory self-incrimination; *Kastigar's* question is nowhere posited here. *Zamora,* while it involved an analysis of the scope of New Mexico's law regarding compulsory self-incrimination, did not address itself to questions of immunity, as no grant of immunity was conferred upon the reluctant witness in *Zamora.*

The contemnor's statements before the grand jury fall squarely within the language of the statute under which she was given immunity, and the falsity of those statements could have been shown only by the testimony she was compelled to give under penalty of punishment for contempt, after her claim of constitutional privilege had been made and overruled, and after she had been granted immunity. Consequently, a charge of perjury, respecting contemnor's previous grand jury testimony, could not have been "predicated upon the falsity of those statements." (*People v. Walker,* at page 591.) That is not to intimate, of course, that contemnor would not have been subject to prosecution for false statements made as a witness testifying during the Berry matter; clearly, she would have been.

## II.

The second issue as styled by contemnor is whether a sentence for contempt with a purge clause may be changed to a definite sentence when the contemnor seeks to purge herself of the contempt. Or, did the court below err in ruling that once the Berry trial had been concluded, contemnor could no longer purge herself of contempt under the May 27th contempt order. Contemnor urges, variously, three arguments which devolve from the stated issue: first, that the court's action on June 21, 1971, was an improper "resentencing" of contemnor; second, that, because contemnor appeared before the court on June 21 and stood ready

to purge herself under the May 27th contempt order, she should have been allowed to do so; and, third—as an alternative to contemnor's second argument—that if purging herself of contempt on June 21 was impossible, then contemnor should have been released from jail on that date.

■■■ We find no merit in contemnor's first contention that the court below resentenced her on June 21, 1971. To put the matter in perspective, the contempt order of May 27, 1971, which sentenced contemnor to incarceration for six months or until such time as she purged herself of her contumacious conduct, was a contempt order criminal, not civil, in nature. The distinctions between the two types of contempt have been set forth in detail by this State's supreme court in *People v. Redlich* (1949), 402 Ill. 270, 83 N.E.2d 736, from which we quote at page 277:

> "Contempts have been classified as civil and criminal contempts. Contempt orders in the two classes of cases are of different kinds and made to different ends. Criminal contempts include acts in disrespect of the court or its process and those tending to bring the court into disrepute or obstruct the administration of justice, while civil contempts consist in failing to do something which the contemner is ordered by the court to do for the benefit or advantage of another party to the proceeding before the court. [Citations.] Imprisonment imposed for a criminal contempt is purely punitive and must be for a definite term. [Citation.] But in cases of civil contempt, the sentence being imposed as a remedial or coercive [*sic*] measure, the appropriate punishment is to commit the contumacious party to imprisonment until he has complied with the mandate of the court, since a fine or imprisonment for a specified term might not secure obedience to the order. [Citation.]"

It is clear from the record presented to this court that one sentence—and one sentence only—was entered against contemnor, and that sentence of six months incarceration was imposed on May 27, 1971. The sentence imposed stemmed from a finding by the court that contemnor was guilty of criminal contempt, and, as is evident from a reading of the record, the imposition was "purely punitive." As stated in *People v. Carradine* (1972), 52 Ill.2d 231, 233, 287 N.E.2d 670, a witness' refusal to testify clearly obstructed the court in its administration of justice. Here the trial court acted with painstaking care after counsel for the contemnor had an ample opportunity to confer with the contemnor and after lengthy discussion by all counsel in the presence of the contemnor and the court. Moreover, again referring to the record, it is manifest that the colloquy between the court below and contemnor's attorney during

the June 21 hearing was, in essence, an interpretation by the court of its May 27 contempt order.

With respect to contemnor's argument that she should have been allowed to purge herself on June 21 even though the Berry proceedings had resulted in a directed verdict of not guilty, we find that, although the contempt order of May 17, 1971, may have been seemingly ambiguous [2] in that it afforded contemnor the opportunity to purge herself, the court acted within its powers when it interpreted the order in the manner in which it did; that is, that contemnor could only have purged herself of her contumacious conduct by answering questions propounded at the Berry trial (*Illinois Crime Investigating Com. v. Tolomeo* (1971), 47 Ill.2d 393, 395, 266 N.E.2d 322.) In *People v. Baxter* (1972), 50 Ill.2d 286, 290, 278 N.E.2d 777, our supreme court held it was proper to consider the record to determine the correctness of a contempt order. See also *People v. Carradine* (1972), 52 Ill.2d 231, 233, 287 N.E.2d 670.

Moreover, ample support for the proposition that contemnor and her counsel were well aware of the import and meaning of the May 27th order, in all of its particulars, can be found in a careful reading of the record furnished us. It is readily apparent—from colloquies between contemnor, counsel, and the court—that contemnor could not have claimed surprise in finding that her chance to purge herself of contempt was extinguished upon the termination of the Berry proceedings.

Contemnor relies upon *Shillitani v. United States* (1966), 384 U.S. 364, 16 L.Ed.2d 622, 86 S.Ct. 1531. (This was one of a group of contempt cases decided by that court on June 6, 1966.) The contemnors in *Shillitani* and *Pappadio* (consolidated in the Supreme Court) had refused to testify before a grand jury under immunity granted by the respective district courts. Neither petitioner was indicted or given a jury trial. Both were found guilty and sentenced to two years imprisonment with the proviso that, if either answered the questions before his sentence ended, he would be released. The Supreme Court held that the conditional nature of each sentence rendered each of the actions a civil contempt proceeding, and, as the term of the grand jury had expired and no further opportunity existed for the contemnors to purge themselves of contempt, the judgments were vacated.

It is to be noted that, in *Shillitani*, the district judge stated the sentence was not intended so much by way of punishment as *solely* to secure testi-

---

[2] It is possible this ambiguity would have been avoided if, prior to the termination of the trial of *People v. Berry*, the order of the court *only* committed the contemnor to imprisonment until she purged herself or until the termination of the case in chief and further order of the court. At the conclusion of the case in chief, and the contemnor not having purged herself, the court then could have entered its sentence.

mony for the grand jury; whereas, in the case at bar, the six month sentence was primarily intended as punishment for contumacious conduct. In *Pappadio*, the trial court viewed the matter as civil contempt. As Justice Clark stated in his opinion (p. 369), counsel for all parties "* * * conceded at argument that the contempt orders were remedial, and, therefore, might well be deemed civil in nature rather than criminal." Also, at page 370, the opinion said: "The test may be stated also: what does the court primarily seek to accomplish by imposing sentence? Here the purpose was to obtain answers to questions for the grand jury." It is also noted that in cases decided earlier than *Shillitani* and *Pappadio*, e.g., *McCrone v. United States* (1939), 307 U.S. 61, 83 L.Ed. 1108 (involving a refusal to comply with an Internal Revenue summons), *Giancana v. United States* (7th cir. 1965), 352 F.2d 921, *cert. denied*, 382 U.S. 959 (refusal to testify before a grand jury), and *Reina v. United States* (1960), 364 U.S. 507, 5 L.Ed.2d 249, 81 S.Ct. 260 (refusal to testify before a grand jury), the principle developed that a contumacious witness may be imprisoned for so long as the opportunity exists to purge himself of contempt. Such action has been characterized as "coercive imprisonment" (*Shillitani*, p. 371).

In the case at bar, upon the contemnor's receipt of immunity and continued refusal to testify at the trial involving a murder charge, the record clearly indicates that the trial court imposed the sentence to uphold the dignity and authority of the court acting in a judicial capacity. We do not think the holding of *Shillitani* applies in this case.

Finally, regarding contemnor's position that she should have been released from incarceration on June 21, 1971, we find, again, that contemnor has assumed an untenable position. The May 27th order, under which contemnor was found to be in criminal contempt of court, specified a definite sentence of six months incarceration, although contemnor was afforded the opportunity of purging herself of contempt; however, as we have stated above, the interpretation placed upon that order was to the effect that contemnor's opportunity to do so was, perforce, to have ceased to be available upon the conclusion of the Berry murder trial. The Berry proceeding no longer existed when contemnor sought to avail herself of the opportunity. Therefore, contemnor's release from incarceration at that point in time would have been wholly improper.

Accordingly, and for the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

STAMOS, P. J., and HAYES, J., concur.